Kevin E. HILL, Appellant,

v.

UNITED STATES, Appellee.

No. 84–1788.

District of Columbia Court of Appeals.

Argued Nov. 25, 1985.

Decided July 3, 1986.

Jonathan Krinick, Washington, D.C., for appellant.

Mark S. Dreux, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty. and Michael W. Farrell, Linda Chapman, and Harriet J. McFaul, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before FERREN, BELSON and STEADMAN, Associate Judges.

FERREN, Associate Judge:

After a bench trial, the court convicted appellant for possession of cocaine, D.C. Code § 33–541(d) (1985 Supp.), and sentenced him to consecutive prison terms of one year for the possession of cocaine and 90 days for the violation of pretrial release conditions in another case. Appellant contends that the police found the cocaine during an illegal inventory search of his unlawfully impounded car, and thus that the trial court erroneously denied his motion to suppress evidence. He also asserts that the trial court committed reversible error when the court, itself, introduced evidence of appellant's prior convictions. We affirm.

## I.

According to testimony at the suppression hearing, on the night of May 29, 1984, Metropolitan Police Officers Randall and Stewart observed someone, later identified as appellant, in the driver's seat of a Volkswagen which another man was pushing down the street toward the curb. The officers noticed that the car had a homemade, cardboard license tag, with several numbers written on it, instead of properly issued tags. They stopped to investigate.

According to Officer Randall, when she and Officer Stewart asked appellant for his license and registration, he replied that the car was not his, that it had been "rolling down the street," and that he had jumped inside to "stop it from running into someone else." Randall further testified that appellant acknowledged he did not have a certificate of registration for the car and did not have a driver's license. She added that a WALES inquiry confirmed that appellant's driver's license had been suspended.[1]

Officer Randall testified that she and Stewart then arrested appellant for driving

---

[1] In earlier testimony at the suppression hearing, appellant had acknowledged that the car was not properly registered and that his driver's license had been suspended. He also had testified, however, contrary to Officer Randall's later testimony, that he had told the officers the car was his, that it had stalled in the middle of the road, and that he had enlisted the help of a passer-by to push it over to the curb.

with a suspended license. Randall removed the keys from the Volkswagen "for safety" and shut the car door. She added, "We couldn't just leave the keys in the car." The officers drove appellant to the police station, where one of them called for a crane to tow the car to the impoundment lot. In the meantime, Officer Randall, who had kept the keys, began the standard procedure for inventorying a prisoner's property and logging it into the police property book. The keys were attached to a zippered case that looked like a wallet. Because Randall previously had felt something inside the key case and thought it was money, she opened the case, intending to make an entry in the property book identifying the contents. Inside, she found several aluminum foil packets. They contained what later was identified as cocaine.

## II.

Appellant contends the trial court erroneously denied his motion to suppress because the police unlawfully had impounded the Volkswagen and conducted an illegal inventory search that yielded the key case and, eventually, the cocaine.

## A.

■ Initially, we note that, in order to assert standing to challenge the impoundment and search, appellant had to claim a legitimate expectation of privacy in the Volkswagen and its contents. *Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980); *United States v. (Harvey) Johnson*, 496 A.2d 592, 595 (D.C.1985). In his motion to suppress and later at the suppression hearing, appellant asserted that the car, the keys, and the key case were his. This claimed property interest is enough to establish the required expectation of privacy. *See Rakas v. Illinois*, 439 U.S. 128, 148, 99 S.Ct. 421, 433, 58 L.Ed.2d 387 (1978).

We note that Officer Randall testified, at the suppression hearing, that at the time of appellant's street encounter with the police he denied owning the Volkswagen; she said appellant claimed he merely had jumped into a car "rolling down the street." Appellant testified, to the contrary, that he had told the police the car was his. *Supra* note 1. The trial court made no finding as to this conflicting testimony. That does not matter, however, since both the government and appellant have proceeded from the premise that the car and the key case, containing cocaine, belonged to appellant.

This is not to say that the unresolved question whether appellant asserted an ownership interest in the Volkswagen at the time of arrest is altogether irrelevant. Theoretically, it could have a bearing on determining what police impoundment regulation, if any, applied under the circumstances—a merits issue with which we deal later.

## B.

■ There is another intriguing, threshold question. Is the opening and search of appellant's wallet-like, zippered key case at the police station better characterized as part of the inventory search of appellant's automobile, since Officer Randall removed the keys and case directly from the Volkswagen at the time of appellant's arrest and took them with her to the station solely "for safety" before the tow truck arrived? Or is the search of the key case more properly viewed as part of an inventory of appellant's personal effects, since Officer Randall brought it, with appellant, to the police station and searched it there instead of leaving it locked in the car awaiting impoundment?[2]

This issue is of significance for two reasons: First, if this was an automobile inventory, there is an unresolved question

**2.** The government asks us, alternatively, to sustain the seizure of the cocaine on the ground that the search of the key case was incident to a lawful arrest. Because we conclude that this case can be properly resolved on an inventory search rationale, we do not address this "search incident" possibility which, on the facts here, has a complex analysis of its own.

whether the police were entitled to open a closed container found inside, such as the zippered key case,[3] whereas the police appear to have unlimited constitutional authority to open closed containers found during a personal effects inventory of a suspect at the police station.[4] Second, if this was, instead, a personal effects inventory, it was justified only if appellant was to be booked and jailed,[5] whereas police authority to impound and inventory and automobile is not necessarily related to the custodial or liberty status of the owner.[6]

These distinctions between automobile and personal effects inventories may be narrowed if not substantially eliminated when the Supreme Court decides *Colorado v. Bertine, supra* note 3, next term. In the meantime, we have to resolve this case, and either characterization of the inventory at issue presents problems.

If the search of the key case can better be characterized as part of the automobile inventory, then any question about jailing appellant will be irrelevant and our focus will be on whether the police properly opened a zipper-closed container found inside the car. If, however, the search of the key case, under the circumstances, had become a personal effects inventory by the time the police arrived with appellant at the police station, then the authority to open the zipper-closed container is easily established, but we would have to remand for a finding as to whether appellant "was to have been incarcerated after being booked," *Illinois v. Lafayette*, 462 U.S. 640, 648 n. 3, 103 S.Ct. at 2611 n. 3 (1983); *see supra* notes 4 and 5, since the record of this case does not tell us.[7]

On this record, we conclude that the search of the key case emanated, fundamentally, from the impoundment and inventory of an unregistered automobile from which Officer Randall took the keys "for safety" (and, of necessity, for verification of ownership) rather than leave them in the car until the tow truck arrived. The search is not as easily characterized as an inventory of appellant's personal effects, for the key case was not taken from appellant

---

3. *People v. Bertine*, 706 P.2d 411 (Colo.1985) (en banc) (police violated Fourth Amendment during automobile inventory search by opening zippered backpack containing zippered nylon bag containing "sealed" or "secured" coffee cans), *cert. granted*, —— U.S. ——, 106 S.Ct. 1457, 89 L.Ed.2d 715 (1986).

4. *Illinois v. Lafayette*, 462 U.S. 640, 648, 103 S.Ct. 2605, 2611; 77 L.Ed.2d 65 (1983) (in case of defendant arrested for disturbing peace and brought to police station for booking, held: "not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his [or her] possession, in accordance with established inventory procedures").

5. *Id.*, 462 U.S. at 643, 644, 645, 646, 647, 648 & n. 3, 103 S.Ct. at 2608, 2608, 2609, 2609, 2610–11 & n. 3. Although the Court at least eight times expressly limited its opinion, and thus its sweeping scope, to the inventory of a person who is to be jailed after booking, the Court did not articulate what legal status of the prisoner, or what length of time in the holding cell (or elsewhere), would be necessary to activate *Lafayette*'s rationale. Very likely, the Court limited its holding to situations of "incarceration"—however "incarceration" eventually should be defined—because the Court recognized that a search which could not be justified as incident to a lawful arrest could not be sustained, alternatively, under the inventory rationale if the suspect would be leaving the police station with the property soon after arrival (in contrast, for example, with the inventory of an abandoned automobile). *Id.* at 644–45, 103 S.Ct. at 2608–09.

6. *Compare United States v. Hill*, 458 F.Supp. 31 (D.D.C.1978) (because car lacked valid tags and could not lawfully be left on public way, police properly seized it as evidence) *with Arrington v. United States*, 382 A.2d 14 (D.C.1978) (because automobile itself did not manifest law violation, only valid basis for impoundment would be if driver, arrested for operating vehicle with suspended license, could not make other lawful arrangement for its disposition).

7. We therefore cannot hedge and say that the inventory is a hybrid, automobile and personal effects inventory; nor can we assume for the sake of argument that the inventory could be of either type. Were we to do so, we would have to given the defendant the benefit of the limitations on both types of searches. Because the government, on this record, cannot prevail under the criteria applicable to a personal effects inventory, we must decide what type of inventory search is at issue.

himself, and, in any event, it was taken before the police and appellant arrived at the station where a personal effects inventory by definition takes place.[8]

If the police had been satisfied that appellant owned the car, had permitted appellant to keep the keys during the trip to headquarters, and thus had excluded the keys and key case from their automobile impoundment responsibilities, the situation would have been different. The only available "inventory" basis for searching the key case would have been a personal effects inventory at the police station. *See supra* note 8. But, because the police took the keys from the car and kept them, the key case retained its status as part of the automobile subject to inventory.

The unregistered, unlawfully tagged automobile and its contents presumably would be in police custody for some time as the police attempted to verify ownership and decide upon the appropriate disposition.[9] Thus, appellant's car and its contents were subject to inventory and property recordation without regard to his personal status—liberty or incarceration—after booking.

Whatever stress on incarceration is inherent in *Layfayette*'s reasoning, therefore, that concern is irrelevant here. Whether appellant were to be released immediately or not, the police would retain the keys and key case for a while and have to account for them as part of the automobile inventory. The fortuity of the key case inventory taking place at the police station while appellant was being processed—whereas the rest of the automobile inventory would be happening later at the impounding lot—cannot force a limitation on the scope of an otherwise lawful auto-

mobile inventory. The crucial fact is that the police took the keys and key case from an impounded car, not directly from an arrested person at the police station as in *Lafayette.*

## C.

Three questions remain: (1) whether the police impounded the car lawfully; (2) if so, whether they lawfully could inventory its contents, including the contents of appellant's zippered-shut key case; and (3) if so, whether the police inventory procedures themselves are lawful and were lawfully implemented.

### (1)

■ We consider, first, the legality of the impoundment. In other cases, we have proceeded on the assumption that a lawful impoundment presupposes compliance with police regulations that legitimately authorize the police to take custody of a car in the particular situation. *E.g., Schwasta v. United States,* 392 A.2d 1071, 1073–74 (D.C.1978); *Arrington v. United States,* 382 A.2d 14, 18 (D.C.1978). We do not foreclose the possibility that the police could lawfully impound a vehicle in circumstances not covered by a department regulation, but that situation is not presented here. There are applicable Metropolitan Police Department regulations governing "Automobile Searches and Inventories," General Order 602, No. 1 (effective May 26, 1972).

Part I. B. 2. of this General Order provides that "[w]hen an officer has probable cause to believe that a vehicle is a fruit, instrumentality, or evidence of a crime, he [or she] shall take the vehicle into police custody and shall classify it as a seizure as

---

8. A search and seizure incident to a lawful arrest can take place, depending on the circumstances, either before or after a suspect's arrival at the police station; but a personal effects inventory, as we understand it from *Lafayette,* 462 U.S. at 645, 103 S.Ct. at 2609, presupposes arrival at the police station for booking and jailing.

9. As it turns out, *infra* Part II.C.(1), the car was properly seized and impounded as evidence; thus, the police could not release the car "to any person until the appropriate prosecutor ha[d] signed the proper release form indicating that the vehicle [was] no longer needed as evidence." Metropolitan Police Department General Order 602, No. 1, "Automobile Searches and Inventories," Part I.B.2.c. (effective May 26, 1972).

evidence." That provision further states that "vehicles shall *not* be seized as evidence simply because they were involved in relatively minor traffic offenses," such as "a moving or a parking traffic violation." *Id.* at Part I. B. 2. a. But, "if a vehicle has some evidentiary value beyond the fact that it was used to commit a minor traffic offense it shall be seized as evidence." *Id.;* *see also* Metropolitan Police Department General Order 303, No. 3, Part I. B. 1. (effective December 28, 1979) ("Vehicles may be impounded as either the proceeds of crime or as an implement of crime depending upon the circumstance").

Appellant's car was unregistered and had no valid license tags. D.C.Code § 40–105 (1981) imposes criminal penalties—up to a $300 fine and/or up to 30 days imprisonment—for the operation of a vehicle "upon any public highway of the District of Columbia" if the vehicle is not registered or does not have valid license tags at-

tached, or if the operator does not have available a copy of the registration certificate. Clearly, therefore, an unregistered automobile does not reflect a minor traffic offense; it is among the motor vehicle offenses still subject to criminal, not merely administrative, adjudication. D.C.Code § 40–612(7) (1981). Furthermore, when a car is unregistered or has invalid tags, the car itself is the best evidence of the criminal offense. Accordingly, any police officer who discovers an unregistered or improperly tagged vehicle may, as in this case, lawfully take custody of the vehicle and have it impounded as evidence—an obviously legitimate police concern. *See Punch v. United States,* 377 A.2d 1353, 1357 n. 5 (D.C.1977), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978) (dicta) (because occupants of car were under arrest and car lacked valid tags, police properly impounded it); *United States v. Hill,* 458 F.Supp. 31 (D.D.C.1978) (same.) [10]

---

**10.** Impoundment of appellant's unregistered vehicle does not fit within the classifications applicable to other situations covered by General Order 602, No. 1, Part I.B.: "seizures for purposes of forfeiture," "prisoner's property," "traffic impoundments," and "non-criminal impoundments."

Appellant's automobile would be classified as "prisoner's property" if the only law enforcement concern were appellant's suspended license, not the evidentiary value of the unregistered car itself. As "prisoner's property," however, a vehicle cannot be impounded without first giving the prisoner an opportunity to make other lawful arrangements for its disposition, *Arrington v. United States,* 382 A.2d 14, 18 (D.C. 1978), such as calling a spouse to have the car towed away. *See* General Order 602, No. 1, Part I.B.3.a. When a vehicle arguably might be impounded under either classification—"seizure as evidence" or "prisoner's property"—the former rationale prevails. *Id.* at Part I.B.3. ("vehicle shall be classified as prisoner's property" only if it "cannot be classified" as a seizure for purposes of forfeiture or as evidence). The police were aware that appellant's car was unregistered and lacked valid license tags, although they arrested appellant only for driving with a suspended license. This proclaimed basis for the arrest, however, did not preclude the government from also charging a violation of D.C.Code § 40–105(a) (1981) (unregistered vehicle). Because of this realistic possibility, therefore, the impoundment was justified as a "seizure as evidence."

The "traffic impoundments" classification does not apply because it only covers impoundments of unattended vehicles violating parking regulations, not vehicle registration requirements. General Order 602, No. 1, Part I.B.4.: 18 D.C.M.R. § 2418.1 (1981) (formerly D.C. Traffic and Motor Vehicle Regulations 17 DCRR § 91, now 18 D.C.M.R. § 2421.1 (1985)); *Arrington,* 382 A.2d at 18 n. 7.

Finally, the "non-criminal impoundments" classification would have been applicable if, for example, the police had reason to believe that the Volkswagen was "abandoned." General Order 602, No. 1, Part I.B.5. According to Officer Randall's testimony, appellant said at the time of the street encounter that he had jumped into a car "rolling down the street"—an assertion arguably implying abandoned property. Appellant, however, testified that he had told the officers the unregistered car was his. As indicated in our discussion of appellant's standing to challenge the impoundment and search, the court did not make a finding as to this conflicting testimony. *Supra* Part II.A. As it turns out, however, even if the car had been abandoned, justifying a non-criminal impoundment, the authorized scope of the inventory search would have been the same as for a "seizure as evidence." General Order 602, No. 1, Part I.B.2.b. and Part I.B.5., both incorporating Part I.B.6.

Apparently, there is only one situation that would require the trial court to resolve a dispute as to whether a suspect affirmed or denied ownership of a car at the time of impoundment:

This case, therefore, differs from those in which this court properly ordered suppression of evidence seized from a vehicle which had not been lawfully impounded under an applicable regulatory classification. *E.g., Arrington,* 382 A.2d at 18; *Pigford v. United States,* 273 A.2d 837 (D.C. 1971); *United States v. Pannell,* 256 A.2d 925 (D.C.1969); *Williams v. United States,* 170 A.2d 233 (D.C.1961).

### (2)

■ Upon lawfully impounding appellant's car, the police had "the duty to safeguard this property" by taking an appropriate inventory of its contents. *Lewis v. United States,* 379 A.2d 1168, 1170 (D.C. 1977). Appellant contends, however, that any such duty did not include the need or right to open and inventory the zippered-shut key case, in which he asserted a reasonable expectation of privacy. We therefore must examine the rationale and proper scope of an automobile inventory search.

As a general proposition, inventory searches of vehicles lawfully in police custody, conducted according to established police procedures, are not "unreasonable" under the Fourth Amendment and thus are not linked to the probable cause or warrant requirement. *South Dakota v. Opperman,* 428 U.S. 364, 370 n. 5, 96 S.Ct. 3092, 3097 n. 5, 49 L.Ed.2d 1000 (1976); *see Cady v. Dombrowski,* 413 U.S. 433, 445-48, 93 S.Ct. 2523, 2530-31, 37 L.Ed.2d 706 (1973); *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968);

*Cooper v. California,* 386 U.S. 58, 61-62, 87 S.Ct. 788, 790-91, 17 L.Ed.2d 730 (1967). More specifically, an inventory search is justified by three distinct, reasonable needs deemed paramount to the privacy interest: "(1) 'the protection of the owner's property while it remains in police custody,' (2) 'the protection of the police against claims or disputes over lost or stolen property,' and (3) 'the protection of the police from potential danger.'" *In re B.K.C.,* 413 A.2d 894, 904 (D.C.1980) (quoting *Opperman,* 428 U.S. at 369, 96 S.Ct. at 3097); *accord Schwasta,* 392 A.2d at 1073-74. Once a vehicle is lawfully in their custody, therefore, the police may inventory and record its contents, provided the scope of the search is reasonable under the circumstances in light of these three protective purposes. *United States v. Griffin,* 729 F.2d 475, 483 (7th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984); *United States v. Wilson,* 636 F.2d 1161, 1163 (8th Cir.1980); *United States v. Edwards,* 577 F.2d 883, 893 (5th Cir.) (en banc), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978).

Most courts after *Opperman* have sustained, as reasonable, not only a thorough search of the automobile passenger compartment—*e.g.,* inside the glove box, between the seats, and under a loose carpet[11]—but also the search of a trunk[12] or locked camper unit.[13] They also have approved the inventory of at least the unsecured, closed containers found in any of those places, since they might be vulnera-

---

if the suspect credibly asserted registered ownership and, as a consequence, the only basis for impoundment was "prisoner's property," then the suspect (as noted above) would have had the right to prevent impoundment by making an alternative arrangement. *Arrington,* 382 A.2d at 18.

**11.** *United States v. Edwards,* 577 F.2d 883, 894-95 (5th Cir.) (en banc), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978).

**12.** *United States v. Laing,* 708 F.2d 1568 (11th Cir.) (per curiam), *cert. denied,* 464 U.S. 896,

104 S.Ct. 246, 78 L.Ed.2d 235 (1983); *United States v. Long,* 705 F.2d 1259 (10th Cir.1983); *United States v. Bosby,* 675 F.2d 1174, 1179-81 (11th Cir.1982); *Edwards,* 577 F.2d at 894; *United States v. Martin,* 566 F.2d 1143, 1145 (10th Cir.1977). *Contra United States v. Wilson,* 636 F.2d 1161 (8th Cir.1980).

**13.** *United States v. Maier,* 691 F.2d 421 (8th Cir.1982), *cert. denied,* 460 U.S. 1070, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983); *United States v. Dall,* 608 F.2d 910 (1st Cir.1979), *cert. denied,* 445 U.S. 918, 100 S.Ct. 1280, 63 L.Ed.2d 603 (1980).

ble to tampering and loss of property.[14] Interestingly, at least one court which refused to sustain an inventory search of a "tightly sealed" container, since loss was unlikely, *United States v. Bloomfield,* 594 F.2d 1200 (8th Cir.1979), *supra* note 14, was careful to indicate that the result would have been different if the police had reasonably perceived danger from the container, one of the purposes justifying an inventory search.[15]

Although inventory searches commonly relate to impounded vehicles, *see Opperman,* 428 U.S. at 369, 96 S.Ct. at 3097; *In re B.K.C.,* 413 A.2d at 904 n. 17, they extend permissibly, as we noted, to the personal effects of anyone who is arrested and awaiting jail. For example, in *Lafayette,* after the police had arrested the defendant for disturbing the peace and brought him to the police station for booking, the arresting officer inventoried the contents of a shoulder bag the defendant was carrying. The officer found amphetamine pills and charged the defendant with illegal possession of drugs. The Supreme Court reversed the suppression of the amphetamine pills, citing the protective purposes discussed in *Opperman.* The Court concluded "that it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his

[or her] possession, in accordance with established inventory procedures." *Id.* 462 U.S. at 648, 103 S.Ct. at 2611 (footnote omitted). *Accord United States v. Duncan,* 586 F.Supp. 1305, 1311 (W.D.Mich. 1984) (personal effects), *aff'd,* 763 F.2d 220 (6th Cir.1985); *United States v. Goldfarb,* 581 F.Supp. 1141, 1144 (E.D.Mich.1984) (wallet).

Specifically, as to inspection of closed containers, the Court in *Lafayette* said:

> We are hardly in a position to second-guess police departments as to what practical administrative method will best deter theft by and false claims against its employees and preserve the security of the station house. It is evident that a station-house search of every item carried on or by a person who has lawfully been taken into custody by the police will amply serve the important and legitimate governmental interests involved.
>
> Even if less intrusive means existed of protecting some particular types of property, it would be unreasonable to expect police officers in the every day course of business to make fine and subtle distinctions in deciding which containers or items may be searched and which must be sealed as a unit.

462 U.S. at 648, 103 S.Ct. at 2610.[16] Although the Court was dealing only with a

---

**14.** *United States v. Griffin,* 729 F.2d 475, 485–88 (7th Cir.) (partially secured package in unsecured paper bag), *cert. denied,* —— U.S. ——, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984); *Laing,* 708 F.2d at 1571 (unsecured Yahtzee box); *Long,* 705 F.2d at 1261–62 (bag overflowing with mail and checks). *Contra Bosby,* 675 F.2d at 1180–81 (unlocked brief case with latches open).

Courts differ as to whether a particular container is secured or unsecured. For example, in *United States v. Bloomfield,* 594 F.2d 1200 (8th Cir.1979), the court refused to permit an inventory search of a zipper-closed knapsack tied with a string because the court perceived it was "tightly sealed" and thus not vulnerable to loss of its contents. Similarly, in *Bertine,* for which the Supreme Court recently granted certiorari, *supra* note 3, the Supreme Court of Colorado, sitting en banc, invalidated an automobile inventory search of a zippered-shut knapsack, of a zippered-shut nylon bag inside the knapsack, and of four coffee cans inside the nylon bag

described, perhaps inconsistently, as "secured with covers" or "sealed."

**15.** In *Bloomfield,* the court stated that "if police have some reason to believe a container which is to be inventoried holds instrumentalities which could be dangerous even when sitting idly in the police locker, the police may, and should, inventory the contents of the container." 594 F.2d at 1203.

**16.** In justifying the inventory search of "any container or article" in the arrested person's possession, the Court in *Lafayette,* 462 U.S. at 648, 103 S.Ct. at 2611, cited *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), which authorized warrantless searches of vehicles, including closed—even locked—containers, where there is probable cause to believe they contain contraband, and *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), which sustained warrant-

personal effects inventory, it obviously telegraphed considerable leniency with respect to police discretion to open closed containers in any inventory search, since the policies justifying the inventory—whether of personal effects or an automobile—are the same. *See Griffin,* 729 F.2d at 485–86.

The Court in *Lafayette,* however, did not definitively eliminate the possibility that, under certain circumstances, a sturdy, securely locked or sealed container could not reasonably be opened for the protective purposes of an automobile inventory, in contrast with the exigencies justifying a warrantless search of an automobile based on probable cause. *Supra* note 16. But, given the legitimate concern for police safety, as well as for protection of property, *Lafayette,* 462 U.S. at 646, *Opperman,* 428 U.S. at 369, 96 S.Ct. at 3097, and also given the inherent impracticality of predicating constitutional analysis of privacy interests on the nature of a particular closed container, *supra* notes 14 and 16, it would appear that the Supreme Court in *Lafayette* has effectively removed any limitation on opening closed containers as part of an inventory search—whether of personal effects or of an automobile—pursuant to established police procedures. This interpretation of *Lafayette*'s reach is reinforced, in our view, by the Court's granting certiorari in *Bertine, supra* notes 3 and 14, to review the suppression of contraband found during an automobile inventory search of a zippered

knapsack containing a zippered bag containing several "sealed" or "secured" coffee cans.

(3)

■ The final question, then, is whether the police conducted the inventory under reasonable, prescribed police procedures—and did so properly.

General Order 602, No. 1, establishes guidelines for inventorying the contents of motor vehicles impounded by the police department. The applicable guideline, Part I.B.2.b. ("seizures as evidence"), provides:

> An officer who seizes a vehicle as evidence shall completely inventory the contents of the vehicle immediately upon its arrival at a police facility, provided that such an inventory will not damage or destroy any evidence contained therein. The scope of that inventory shall be limited by the rules provided in part I, paragraph B6 of this order.

Part I.B.6. ("scope of inventory") of General Order 602, No. 1, provides:

> Whenever an officer has a right to inventory a vehicle pursuant to this order, the officer shall examine the passenger compartment, the glove compartment, whether or not locked, and the trunk, whether or not locked. Any items of personal property which reasonably have a value in excess of $25 shall be removed from the vehicle and placed in secure custody. All items so removed shall be listed and

---

less searches of passenger compartments, including closed containers, incident to arresting an occupant of the vehicle.

In *Ross,* the Court reinforced the view expressed by the plurality and dissenters alike in *Robbins v. California,* 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981): in determining, for Fourth Amendment purposes, whether there is a reasonable expectation of privacy in the contents of a closed container found during a lawful, warrantless search of an automobile based on probable cause, the nature of the container is irrelevant; "a constitutional distinction between 'worthy' and 'unworthy' containers would be improper." *Ross,* 456 U.S. at 822, 102 S.Ct. at 2171. The *Robbins* plurality had drawn a bright line, reinforcing the privacy interest, by concluding that a warrant is required for the search

of any closed container—whether flimsy or sturdy, or loosely or tightly closed—unless its contents could be deemed in plain view because of its configuration or transparency. 453 U.S. at 426–27, 101 S.Ct. at 2845–46. A year later in *Ross,* however, the Court diminished the privacy interest and scrapped the *Robbins* rule. 456 U.S. at 824, 102 S.Ct. at 2172. In drawing a new bright line, the Court in *Ross* again eschewed reliance on the nature of the container: a warrantless search of an automobile based on probable cause may now extend to locked or tightly sealed containers; it is not limited "by the nature of the container in which the contraband is secreted" but "by the object of the search and the places in which there is probable cause to believe that it may be found." *Id.*

recorded on a property return as provided in General Order No. 601.1. Any container such as boxes or suitcases found within the vehicle shall be opened and any item of personal property found in such containers which reasonably has a value in excess of $25 shall be listed and recorded separately. Immediately upon completion of the inventory, the officer shall make sure that the windows are rolled up and the doors and the trunk are locked.

These provisions require an officer with "a right to inventory" immediately to remove valuable property and to make sure "that the doors and trunk are locked." Implied, therefore, is the right to remove the keys and attached key case from the ignition, in order to safeguard the property and to record such items "on a property return." Furthermore, these provisions imply authority—a "right to inventory"—in the arresting officer who lawfully orders the impoundment to remove and record the keys and key case. That officer need not risk leaving the keys in the car when it is necessary to transport a suspect to the police station for booking before the tow truck arrives to pick up the car. *See* Metropolitan Police Department General Order 303, No. 3, Part I.B.4. (effective December 28, 1979).

In *Schwasta*, 392 A.2d at 1076, this court approved the similar guideline for similar inventories of "prisoner property," Part I.B.3., as a "wholly reasonable method of accomplishing" the three purposes of an inventory search. *See supra* note 10. We conclude the same statement applies to Parts I.B.2. ("seizures as evidence") and I.B.6. ("scope of inventory").

Finally, we inquire whether the prescribed procedures were properly followed in handling appellant's property. Officer Randall's testimony confirms that she did so. Specifically, she stated that she removed the keys from the ignition "for safety." Then, at the police station, she opened the key case to record the contents in the police property book, in order to safeguard

the property. There is no evidence that the inventory "was a pretext concealing an investigatory police motive." *Opperman*, 428 U.S. at 376, 96 S.Ct. at 3100 (footnote omitted). By following General Order 602, No. 1, therefore, the police adhered to the constitutional requirements for an inventory search. *Schwasta*, 392 A.2d at 1075–76. The cocaine found as a result was properly admitted into evidence. *Opperman; Schwasta.*

### III.

■ We turn, finally, to the trial court's reference, sua sponte, to appellant's prior convictions.

After the defense and the government had completed their examinations of appellant at the suppression hearing, the trial court stated, "I ... have read the file, and note that there is a status form in this jacket in this case which lists these convictions." They "are noted in my handwriting as not contested." The court then asked appellant if, in fact, he was the same Kevin Hill who had been convicted of possession of phencyclidine (PCP), possession with intent to distribute marijuana, theft, and larceny. Appellant admitted that he was the same Kevin Hill as to all four convictions. After completing its examination, the court stated it would evaluate these convictions "for impeachment purposes only."

In a hearing on a motion to suppress, the trial court as the finder of fact may properly explore the credibility of a witness. In this connection, it is likely that there will be some information available to the trial court, from the case file, that would not be available to jurors in a jury trial, absent the prosecutor's use of such information. Appellant contends, however, that there is a difference between inquiring as to matters already introduced into evidence and sua sponte introducing evidence against a witness.

We conclude that, even if the court's questions about appellant's prior convictions were inappropriate—an issue we do

not decide—appellant was not prejudiced.[17] At the hearing there was only one area of dispute. According to Officer Randall, appellant initially had told the officers that he did not own the car, whereas appellant himself testified that he had told the police the car was his. If this question had to be resolved, therefore, these convictions might have had a bearing on appellant's credibility. As it happened, however, this question was not material to the suppression issue, which turned on the lawfulness of impounding an unregistered, improperly tagged automobile. The essential facts leading up to appellant's arrest, the impoundment of the car, and the inventory of the key case were uncontradicted. Consequently, appellant's credibility could have had no bearing on the outcome of the case, and the court's error, if any, was accordingly harmless. *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946).

*Affirmed.*

---

17. *See Jackson v. United States,* 117 U.S.App. D.C. 325, 326, 329 F.2d 893, 894 (1964) (per curiam) (in non-jury trial, questioning by court rarely prejudicial to defendant).